**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: ) | |
| ) | |
| ) | |
| RICK LIND METCALF and ) | Case No. 03-31587-JWV |
| LORETTA LYNN METCALF ) | |
| ) | |
| Debtors. ) | |
| ) | |
| NESBITT CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 04-3015-JWV |
| ) | |
| RICK LIND METCALF and ) | |
| LORETTA LYNN METCALF ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

Nesbitt Construction, Inc. ("Nesbitt") filed an adversary complaint against Rick Lind Metcalf and Loretta Lynn Metcalf (collectively the "Debtors") pursuant to 11 U.S.C. § 523(a)(2), (4),and (6), alleging that the principal amount of $18,232.13 should be excepted from the Debtors' Chapter 7 discharge on the grounds that the Debtors allegedly submitted a false lien waiver on a construction project. The Court held a trial in this matter on July 1, 2004, in Carthage, Missouri, at which time the Court took the matter under advisement and ordered the parties to submit post-trial briefs.[1] After consideration of the evidence, the arguments of the parties, and the relevant case law, the Court will deny the relief sought in the adversary complaint and will not except the debt from discharge.

**I. BACKGROUND**

---

[1] At the conclusion of the trial, the Court ruled that Nesbitt failed to present sufficient evidence to establish an exception to discharge pursuant to 11 U.S.C. §§ 523(a)(4) and (6). The Court took the matter under advisement solely on the issue of whether the debt owed to Nesbitt should be excepted from discharge on the basis of § 523(a)(2).

Nesbitt was the general contractor on a bonded public works project to make improvements to the Dickerson Park Zoo in Springfield, Missouri. Nesbitt subcontracted the concrete work to K-Met Construction, LLC ("K-Met"), an entity owned by Loretta Metcalf ("Loretta") and managed by her husband, Rick Metcalf ("Rick"), who is a 17-year veteran in the concrete construction business. Pursuant to the subcontract, K-Met was to receive a total of $66,362.00, paid monthly based on the value of the work performed during that period. Nesbitt retained ten percent of each monthly payment pending completion of the project, totaling $6,636.20.

K-Met successfully completed its concrete work, and on May 3, 2003, Nesbitt sent K-Met a check for $6,636.20 – the amount that Nesbitt had retained from K-Met's progress payments. Along with the check, Nesbitt sent a lien waiver stating:

> NOW, THEREFORE, know ye, that (I) (We) the undersigned for and in consideration of the sum of ... $66,362.00 ... do hereby waive and release any and all lien, claim, or right to lien, on said construction project and premises under the statutes of the State of Missouri relating to Mechanic's Liens, on account of labor, or materials or both, furnished by the undersigned to or on account of said Nesbitt Construction, Inc. for said construction and project premises.

(Pl. Ex. 6, p. 1).

After depositing the check, Loretta signed the lien waiver on behalf of K-Met on May 31, 2002. William Nesbitt, the owner and president of Nesbitt, testified that it was customary to send the final check and the lien waiver request together – with the understanding that if the subcontractor had not paid all of its suppliers then the subcontractor was not to process the final payment. Contrary to William Nesbitt's testimony, Loretta testified that she understood a lien waiver to mean that K-Met had received payment for its work. Like Loretta, Rick also testified that he understood the lien waiver to mean that K-Met would not file a mechanic's lien against the construction project. Nesbitt never requested that K-Met submit any lien waivers from its suppliers. Had Nesbitt made that request, it would likely have learned that K-Met's concrete supplier, Concrete Company of Springfield ("Conco"), was still owed $18,232.13 for materials incorporated into the Dickerson Park Zoo project. On October 7, 2002, Conco sent a demand for payment to Nesbitt, among others, for the unpaid balance and associated attorney's fees.

Although Rick testified that K-Met had always intended to pay Conco for its materials at the time Loretta signed the lien waiver, K-Met had ceased being an economically viable entity. According to Rick, K-Met was never a profitable business and it never had any excess savings, which made cash

flow a constant problem. In addition to cash flow problems, Rick testified that K-Met signed a disadvantageous contract with a union, which was too costly to maintain and too costly to breach. Thus, in March 2003 – three months before Loretta signed the lien waiver – Rick and Loretta formed Met-Con, LLC ("Met-Con"), which, like K-Met, was an entity owned by Loretta and managed by Rick. As Rick testified, the only difference between the two entities was that Met-Con was not tied to the union contract. Met-Con used the same office space, had the same employees, used the same equipment as K-Met, and the new Met-Con entity continued to wind-up the business of K-Met.

Both K-Met and Met-Con used Conco as a major supplier of materials, and at any one time, K-Met or Met-Con had numerous open accounts with Conco. K-Met, then Met-Con, constantly struggled to pay Conco's bi-monthly invoices, especially when K-Met or Met-Con had to deal with non-paying customers. Without any significant savings, Rick testified that K-Met and Met-Con would attempt to "work the system" to pay bills while attempting to continue business operations. Rick also testified that at the time Loretta signed Nesbitt's lien waiver on behalf of K-Met, he did not know for certain that Conco was owed money, but that information was available to him and he acknowledged that his secretary had authorization to use broad discretion in discerning which bills had to be paid immediately and which bills could wait. Rick testified that he believed that Conco would eventually have been paid in full had unrelated events not forced an end to Met-Con.

More specifically, in an effort to ease its constant cash flow problems, Met-Con entered into an agreement with "UCD" in May 2002, whereby Met-Con would factor its accounts receivables to UCD in return for an immediate payment. At the time, Met-Con was performing concrete work at a power plant. After factoring an invoice of $39,000.00 to UCD and using that money to pay bills – including amounts owed to Conco for the Dickerson Park Zoo project – the power plant stopped payment on the check and "UCD" began to seize account receivables from other projects in an effort to recoup its advancement to Met-Con. Without having a positive cash flow, Met-Con was unable to continue business or make further payments to Conco.

By December 2002, Met-Con had sold all of its assets – which it had obtained from K-Met – in an effort to pay its creditors. On December 18, 2003, Rick and Loretta filed a joint petition under Chapter 7 of the Bankruptcy Code. Nesbitt filed an unsecured proof of claim in Rick and Loretta's bankruptcy proceeding based on the amount of Conco's demand.

## II. DISCUSSION

Nesbitt argues that this Court should pierce the veils of K-Met and Met-Con to find personal liability on behalf of the Debtors and then conclude that the Debtors' execution of a lien waiver constituted a false representation because the Debtors had not paid Conco for the material it supplied for the Dickerson Park Zoo project. Nesbitt argues that it was injured as a result of the allegedly false lien waiver on the basis that Nesbitt is facing liability on Conco's mechanic's lien against the bonded Dickerson Park Zoo project when it believed – based on the lien waiver – that all of K-Met's suppliers were paid. For the reasons stated herein, even if Nesbitt could pierce the veils of K-Met and Met-Con to make the Debtors personally liable, the Court finds that any debt owed to Nesbitt arising out of the Dickerson Park Zoo project is dischargeable under 11 U.S.C. § 727.[2]

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for ... property ... to the extent obtained, by-- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." A party asserting a cause of action arising under 11 U.S.C. § 523(a) must prove the underlying fraudulent conduct by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). To succeed in a claim under 11 U.S.C. § 523(a)(2)(A), a creditor must show:

> (1) that the debtor made false representations;
> (2) that at the time made, the debtor knew them to be false;
> (3) that the representations were made with the intention and purpose of deceiving the creditor;
> (4) that the creditor [justifiably] relied on the representations; and,
> (5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987), *overruled in part*, *Field v. Mans*, 516 U.S. 59, 73-74, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995) (adopting a test of "justifiable reliance" over one of "reasonable reliance").

Nesbitt asserts that the lien waiver Loretta submitted on behalf of K-Met was false and misleading on the grounds that: a) the lien waiver represents that the Debtors have met their affirmative statutory duty to pay their suppliers under the Missouri Prompt Pay Act, Mo. Rev. Stat. § 34.057, when in fact the Debtors had not paid Conco; b) the lien waiver was executed two and a half

---

[2] The Court makes no finding here on the validity of Nesbitt's proof of claim in the Debtors' bankruptcy proceeding or the amount, if any, that the Debtors owe to Conco.

months after the final materials were delivered to the job site by Conco and the Debtors had all of Conco's invoices in their possession when they executed the lien waiver; c) the Debtors were in the best position to know if Conco had been paid or not; d) the Debtors failed to check to see if all the suppliers were paid before executing the lien waiver; e) the Debtors accepted final payment for the project without paying Conco, while at the same time Rick was drawing his weekly salary; and f) the Debtors issued the lien waiver three months after Met-Con was formed and into which the Debtors transferred the assets of K-Met, leaving K-Met unable to pay Conco at the time the lien waiver was issued.

Contrary to Nesbitt's assertions, the Court does not find any affirmative statutory duty in the Missouri Prompt Pay Act that would require K-Met to timely pay its suppliers as it was paid for its services. Rather, the Prompt Pay Act provides that Nesbitt, as the contractor, would be authorized to withhold payment to K-Met based on K-Met's failure to make timely payments to Conco for materials. § 34.057.2. While the statute does provide for interest charges to be assessed against a subcontractor for failure to timely pay a material supplier, § 34.057.1(7), no language in the statute places an affirmative duty on K-Met, as a purchaser of materials, to pay its supplier as it is paid by Nesbitt.[3]

Nesbitt's other attempts to demonstrate that the Debtors submitted a false and misleading lien waiver are insufficient to carry Nesbitt's burden of proof. Importantly, the language of the lien waiver – which was prepared by Nesbitt – only states that K-Met waived any right or claim to file a mechanic's lien on account of labor and materials that *K-Met* supplied to the project. Nothing in the language of the lien waiver itself indicates that K-Met was also certifying that all of its suppliers had been paid. While William Nesbitt indicated that the industry custom was that a subcontractor would not submit a lien waiver unless all of its suppliers had been paid, that custom is not reflected in the language of the waiver itself, and was flatly contradicted by Rick Metcalf, who is a 17-year veteran of the concrete construction business, when he testified that he believed the lien waiver to be nothing more than a representation that K-Met would not file a mechanic's lien against the project.

---

[3] Nesbitt also asserts that K-Met has a responsibility under Mo. Rev. Stat. § 429.140 to defend any lien action initiated by Conco. Any duty that K-Met or the Debtors have to defend Conco's demand for payment may be a basis for increasing the amount of Nesbitt's proof of claim in the Debtors' bankruptcy proceeding, but a failure to comply with that alleged duty would not be grounds to except the corresponding debt from discharge under 11 U.S.C. § 523(a)(2)(A).

### III. CONCLUSION

Accordingly, even if Nesbitt could pierce the veil of K-Met to make the Debtors personally liable to Nesbitt – a finding that the Court does not make – the Court finds that the lien waiver submitted by K-Met to Nesbitt was not false or misleading; rather, the lien waiver only represented to Nesbitt that K-Met would not itself file a mechanic's lien against the Dickerson Park Zoo project, and that representation was true.[4]

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

**ENTERED** this 26th day of July 2004.

>  /s/ Jerry W. Venters
>  HONORABLE JERRY W. VENTERS
>  UNITED STATES BANKRUPTCY JUDGE

A copy of the foregoing was sent
electronically or conventionally to
Joshua K. Roberts
Lee J. Viorel

---

[4] The Court would urge Nesbitt and its lawyers to consider revisions to its lien waiver document to avoid reoccurrence of this problem.